## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH DOE, by and through his Parents, JOHN DOE and JANE DOE, Plaintiffs, )<br><br>v. )<br><br>HAMPDEN-WILBRAHAM REGIONAL SCHOOL DISTRICT, and BUREAU OF SPECIAL EDUCATION APPEALS Defendants. | Civil Action No. 08cv12094-NG |

GERTNER, D.J.:

## MEMORANDUM AND ORDER RE:
## FINDINGS OF FACT AND CONCLUSIONS OF LAW
May 25, 2010

## I.    INTRODUCTION

This case arises out of plaintiffs' appeal of a September 2008 Bureau of Special

Education Appeals decision finding the special education services defendant Hampden-

Wilbraham Regional School District provided to the plaintiff, Joseph Doe,[1] between 2005 and

2008 to be adequate.  Joseph, by and through his parents, John and Jane Doe, brings suit against

the defendants, Hampden-Wilbraham Regional School District and the Bureau of Special

Education of the Massachusetts Department of Elementary and Secondary Education ("BSEA"),

under the Individuals with Disabilities Education Act ("IDEA"), 28 U.S.C. §§ 1400 et seq.

On appeal, the plaintiffs contend that the agency decision should be reversed because the

hearing officer (1) failed to address several potentially dispositive legal arguments the plaintiff

set forth during the hearing; and (2) failed to acknowledge the district's submission of additional

---

[1] The real names of the plaintiffs have been protected under seal.

material evidence that was contradictory to and/or inconsistent with the evidence upon which the

hearing officer relied.

This opinion comprises my findings of fact and conclusions of law.  After careful review

of the record, with due regard to the purposes of the law in question, I find for the defendants,

Hampden-Wilbraham Regional School District and the Bureau of Special Education Appeals.

## II.    STANDARD OF REVIEW

Under the IDEA, states that receive federal funding to provide special education and

related services to children with disabilities must provide a free and appropriate public education

("FAPE") to all children with disabilities residing in the state between the ages of three and

twenty-one.  20 U.S.C. § 1412(a); 34 C.F.R. § 300.101(a).  A FAPE, in essence, is a requirement

that participating states provide, at public expense, "personalized instruction with sufficient

support services to permit the child to benefit educationally from that instruction." Bd. of Educ.

v. Rowley, 458 U.S. 176, 203 (1982).  School districts must provide a FAPE through the creation

and implementation of written Individualized Education Programs (IEPs) developed by the

school district and parents ("the IEP Team") that identify short and long term goals, specific

educational services to be provided in furtherance of those goals, and objective and measurable

criteria to evaluate progress.  20 U.S.C. § 1414(d)(2); 34 C.F.R. §300.112; Lenn v. Portland

School Comm., 998 F.2d 1083, 1086 (1st Cir. 1993).

A party may bring a complaint to the local education agency ("LEA") with respect to any

matter relating to the provision of a FAPE.  20 U.S.C. § 1415(b)(6).  In response, the LEA (here,

the BSEA) must first convene a resolution meeting with the parents and the relevant members of

the student's IEP Team who have specific knowledge of the facts in the parents' complaint.  Id. §

1415(f)(1)(B).  If matters cannot be resolved, the LEA  then must hold a due process hearing in which it considers all relevant evidence and reaches a fair, independent, and impartial decision based on the issues and evidence presented.  Id. § 1415(f)(1); 603 C.M.R. § 28.08(5)(c).

Once the LEA has issued a decision, a party may appeal the decision by bringing a civil action in district court.  20 U.S.C. § 1415(i)(2).  Under such an action, "the court (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  Id. § 1415(i)(2)(C).  The party challenging the agency decision (here, the plaintiffs) bears the burden of proving that the agency's decision was wrong and that the district court should therefore overturn it.  Roland M. v. Concord Sch. Comm., 910 F.2d 983, 991 (1st Cir. 1990).

In reviewing an agency's decision, a district court must give "due weight" to the administrative proceedings.  Rowley, 458 U.S. at 206.  The "preponderance of the evidence" standard of review is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."  Id.  Instead, a district court must apply "an intermediate standard of review."  Lenn, 998 F.2d at 1086.  This standard is "characterized by independence of judgment" and therefore "requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete de novo review."  Id.  What weight a judge chooses to give to the administrative proceedings "is subject to the district judge's exercise of informed discretion," but a district court judge "is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason."  Id. at 1087.  Therefore, the "judicial function" is "'one of

involved oversight.'"  Id., quoting Roland M., 910 F.2d at 989.  A court is "free to accept or reject the [administrative] findings in part or in whole" as long as it carefully considers and endeavors to respond to all material findings.  Burlington v. Dep't of Educ., 736 F.2d 773, 792 (1st Cir. 1984).

In reviewing an agency's decision, a court must determine whether the agency made any errors of law.  Ross v. Framingham Sch. Comm., 44 F. Supp. 2d 104, 111 (D. Mass. 1999).  The agency's legal conclusion are subject to *de novo* review and a finding on a mixed legal-factual issue cannot stand if it is premised on an error of law.  Id. at 111-12.  Barring any legal errors, though, the court should give due deference to the factual findings of the hearing officer when reviewing a LEA's decision.  Id. at 112.

## III.   FINDINGS OF FACT

Given the hearing officer's specialized knowledge, his detailed and lengthy decision, and the deferential standard of review given to the hearing officer's findings of fact, see id., the plaintiffs face an uphill battle, to the extent they ask the Court to overturn the BSEA's factual findings.  After reviewing the evidence presented in their motion for summary judgment and at the bench trial, plaintiffs have failed to convince me that the hearing officer's findings of fact were incorrect.

Joseph Doe is a twelve year old boy with autism.  (Administrative Record ("AR") Ex. Vol. I at 533.)  During all times relevant to this proceeding, Joseph lived with his parents in Wilbraham, Massachusetts.  (Id.)  From 2002 to June 2007, Joseph attended schools within the Hampden-Wilbraham public school district.[2]  (Id.)

---

[2] For a brief period between 2002 to 2007, Joseph left the Hampden-Wilbraham public school district to attend a Collaborative program, but this is not relevant to this case.  (AR Ex. Vol. I at 533.)

The IDEA required the Hampden-Wilbraham school district to provide Joseph with a FAPE.  20 U.S.C. § 1412(a); 34 C.F.R. § 300.101.  A FAPE includes an Individual Education Program ("IEP"), which an IEP Team (district staff and the student's parents) must develop.  20 U.S.C. § 1414(d)(2); 34 C.F.R. § 300.112.  Joseph began receiving these special education services, including IEPs, at age three.  (AR Ex. Vol. I at 533.)  Joseph's parents accepted his IEPs up until March 2007.[3]  ( Id.)  They attended the meetings at which the IEPs were developed and signed statements asserting their consent.  (AR Ex. Vol. III at 1428, 1430, 1449, 1450.)

In March 2007, a series of events began that led to Joseph being without an IEP for the first time since enrolling in the Hampden-Wilbraham school district.  (AR Ex. Vol. I at 535.)  Joseph's 2006-07 school year IEP was set to expire in March (id. at 533, 535), so the IEP Team scheduled a meeting on March 21, 2007 to develop a new IEP to replace it (id. at 533; AR Ex. Vol. III at 2151).  Before the meeting, however, Joseph's parents received a written evaluation of Joseph which Hampden-Wilbraham had conducted that showed Joseph had not progressed as much as they had hoped.  (AR Ex. Vol. IV at 2303; AR Tr. Vol. IV at 50:10-51:3.)  Joseph's parents canceled the Team meeting approximately 10 minutes before it began, and did not attend an IEP Team meeting scheduled for May 23, 2007.  (AR Ex. Vol. I at 533.)

In June 2007, the parents requested an emergency IEP Team meeting to discuss Joseph's educational services (including new IEPs) for the summer and upcoming school year.  (AR Ex. Vol. III at 1620.)  The school district was unable to schedule a meeting in June.  (Id. at 1626, 1629-30.)  On June 28, Joseph's parents rejected the district's IEP services for the summer,

---

[3] At one point, the parents partially rejected an IEP in order to receive clarification of the amount of time one of Joseph's service providers would spend with him, but later accepted this IEP.  (AR Ex. Vol. I at 533.)

unilaterally removed him from the Hampden-Wilbraham school district, and placed him in

Realizing Children's Strengths ("RCS"), a private school located in Natick, Massachusetts.  (AR

Ex. Vol. II at 581-82.)  Before this removal, because the IEP Team had not met to develop a new

IEP, the school continued to abide by the 2006-07 IEP.  (AR Ex. Vol. I at 545.)

 Throughout the end of June and July, both parties suggested alternative dates for the IEP

Team meeting but were unable to agree on a date that would work.  (AR Ex. Vol. III at 1626-36.)

On August 3, the plaintiffs filed a request with the BSEA for a hearing against Hampden-

Wilbraham seeking reimbursement of their expenses relating to Joseph's education, as well as an

appropriate educational program and placement prospectively.  (AR Ex. Vol. I at 1-10.)  The

BSEA set August 13 as the deadline for the school district to file a response to plaintiffs' hearing

request, which the district failed to meet.  (Id. at 11.)  On August 16, the plaintiffs filed a motion

to compel a response to the hearing request.  (Id. at 13–15.)  The district responded on August 21

with a challenge to the sufficiency of the hearing request, asking the parents to provide specific

information regarding their complaints, which the district considered "vague[,] overly broad,

nonspecific and wholly general [in] nature."  (Id. at 19-23.)  Since the BSEA had listed August

20 as the deadline for convening the resolution session, id. at 11, on August 23 the plaintiffs filed

a motion to compel the session, with plaintiffs' counsel indicating that she would be willing to

meet on August 31 (id. at 25-27).  The district scheduled a resolution meeting for August 31.

(AR Ex. Vol. III at 1638.)  Neither the parents nor their counsel attended.  (AR Ex. Vol. I at

534.)  Hampden-Wilbraham's school year commenced on August 29.  (AR Ex. Vol. IV at 2243.)

 Throughout September of 2007, the parties were unable to schedule a meeting date that

suited both sides.  The school district scheduled an IEP Team meeting for September 17.  (AR

Ex. Vol. I at 534.)  Ms. Doe contacted the district on September 12 and told them not to hold a

meeting.  (Id.)  The district called Ms. Doe back and encouraged her to attend.  (Id.)  The entire

Team assembled for the meeting on September 17, without the Does, and it was once again

canceled.  (Id.)

     The IEP Team, including the parents, finally met on October 11 and 24 to develop a new

IEP for Joseph.  (Id.)  During those meetings, the Team promulgated a new IEP for Joseph for

the 2007-08 school year.  (Id.)  In January 2008, the Does rejected it.  (Id.)

     Although originally scheduled for September 2007, due to continuance requests on both

sides, the BSEA hearing did not commence until January 2008.  (AR Ex. Vol. I at 534.)  The

hearing took place over nine days between January 2008 and July 2008.  (Id. at 543-45.)  The

hearing officer issued a decision on September 19, 2008, finding:

> (1)    The 2007-2008 IEP was appropriate to address Joseph's special education needs
> so as to provide him with a FAPE;
> (2)    Hampden-Wilbraham was not financially responsible for any part of the parents
> placement of Joseph at RCS;
> (3)    Hampden-Wilbraham was not liable for the absence of an IEP for Joseph from
> March to October 2007; and
> (4)    Hampden-Wilbraham was not responsible for providing compensatory
> services/reimbursement for Joseph dating back to the summer of 2005.

(AR Ex. Vol. I at 546.)

     On December 17, 2008, the plaintiffs filed this civil action in this United States District

Court, asking the court to review the hearing officer's September 19, 2008 decision.

## IV.    BENCH TRIAL

     The Court held a short bench trial on April 13, 2010.  The plaintiffs sought to introduce

additional evidence concerning Joseph's progress at RCS and in the Wellesley Public Schools as

well as testimony from an expert about his impressions of the Hearing Officer's findings.  For

plaintiffs to present additional evidence, they generally must show special circumstances.

Roland M., 910 F.2d at 997.  While the First Circuit has rejected a per se rule that would

disallow testimony from all who did, or could have, testified at the administrative hearing,

Burlington, 736 F.2d at 773, the plaintiffs  must give some basis for the introduction of

additional evidence.  Plaintiffs failed to do so here.  The Court denied the motion based on the

plaintiffs' failure to describe the nature of the evidence and why it would be useful for the

district court, or, indeed, even give the name of the expert.

## V.     DISCUSSION

The plaintiffs contend that the hearing officer failed to address several dispositive issues

that they had set forth during the hearing, including: whether the school committed various

procedural violations that denied Mr. and Ms. Doe the right to participate in the educational

process and resulted in a denial of a FAPE to Joseph and whether the school failed to implement

Joseph's IEPs from August 2005 to June 2007, and if so, whether this constituted a denial of a

FAPE, as demonstrated by Joseph's alleged lack of meaningful educational progress.  The

plaintiffs also allege that the hearing officer erred in finding the 2007-08 IEP to be appropriate.

Finally, plaintiffs allege that RCS provided Joseph with an adequate education.  The hearing

officer did not reach this issue because he concluded Hampden-Wilbraham provided Joseph with

a FAPE.

### A.     Alleged Procedural Violations Regarding 2007-08 IEP

The Does allege the school committed the following procedural violations:  (1) the

school district did not give the parents adequate notice of meetings to develop the 2007-08 IEP;

and (2) the school failed to have an IEP in place before the start of the 2007-08 school year.  The

parents raised these issues during the BSEA proceeding. (See, e.g., AR Ex. Vol. I at 256-57, 309-19.)  Parents raising procedural claims may only recover if there is "some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits."  Roland M., 910 F.2d at 994-95.

Neither side questions that the absence of an IEP for Joseph at the start of the 2007-08 school year was a violation of the IDEA.  See 34 C.F.R. § 300.323(a) ("At the beginning of the school year, each public agency must have in effect, for each child with a disability within its jurisdiction, an IEP.")  The question therefore is whether any reason exists to excuse the school district from this obligation.

The hearing officer answered this question affirmatively, finding that the parents' failure to attend several IEP Team meetings caused the delay in proposing a 2007-08 IEP.  (AR Ex. Vol. I at 544-45.)  The hearing officer noted that the district set up meetings on March 21, May 23, August 31, and September 17 of 2007, all of which the parents failed to attend.  (Id. at 533-534.) The parents canceled the March meeting ten minutes prior to its start when the rest of the IEP Team had already assembled.  (Id. at 533.)  As for the May meeting, the parents insist that they never had notice of it.  (AR Tr. Vol. IV at 100:10-22.)  The hearing officer, however, found the testimony of Dr. Tobias, the district's special education coordinator and IEP Team chairperson, to be credible.  (AR Ex. Vol. I at 533.)  Dr. Tobias stated that he had spoken with Ms. Doe prior to the May meeting and urged her to attend.  (Id.)  By the end of the school year, the parents therefore had two opportunities to meet with the school to develop new IEPs for the summer and 2007-08 school year, but failed to take advantage of them.

The August meeting was arranged at the request of plaintiffs' attorney as required as part of the BSEA hearing process, but the parents failed show up once again. (Id. at 25-27, 534; AR Ex. Vol. III at 1638.)  The district scheduled another meeting for September 17.  (AR Ex. Vol. I at 534.)  Five days before the meeting, however, Ms. Doe called the district and told them not to set up a meeting to develop the IEP.  (Id.)  Once again, Dr. Tobias encouraged Ms.  Doe to attend the meeting.  (Id.)  The district ultimately canceled the meeting on September 17 when the parents did not show up.  (Id.)  The IEP Team finally was able to develop an IEP for Joseph when everyone, including the parents and counsel for both sides, attended meetings on October 11 and 24.  (Id.)

Based on these facts, the hearing officer found that the parents were responsible for the IEP Team's failure to meet before the school year started and its failure to develop an IEP for Joseph.  (Id. at 544.)  The hearing officer correctly noted that a district may be relieved of its obligations to have an IEP in place if the parents are responsible for obstructing the process.  (Id. at 544-45; see Lessard v. Wilton Lyndelborough Coop. Sch. Dist., 518 F.3d 18, 27 (1st Cir. 2008).  The question of who was ultimately responsible is a finding of fact, and, as to that, the hearing officer's determination is entitled to due weight.  Rowley, 458 U.S. at 206.  Based on a preponderance of the evidence, I find his findings that the plaintiffs were responsible for the delays supported by the record.

There is no doubt that the parents bear the responsibility for the failure to meet from March until May 2007.  What is less clear is where the burden of responsibility for a failure to meet again from June until August 31 should be placed.  At the bench trial and in their briefs, the plaintiffs noted that on numerous occasions in June they had requested that the district set up an

"emergency" IEP meeting immediately, which the record shows.  (AR Ex. Vol. III at 1620.)

These requests set off a three month long back and forth between the two sides to set up a

meeting.  (See id. at 1626-47.)  It is uncontested that the district failed to set up a meeting in June

in response to these requests.  (Id. at 1630).  Counsel for the district explained that this failure

was due to "previously scheduled commitments" on the part of members of Joseph's IEP Team.

(Id.)  The district did, however, offer on June 20 to set up an IEP meeting on either July 9 or 10.

(Id. at 1627.)  In response, the plaintiffs' attorney noted that she would be out of the state for

those dates and suggested the Team meet during the week of July 16.  (Id. at 1628.)  The district

was unable to arrange a meeting during the week of July 16 due to its inability to secure the

attendance of essential Team members.  (Id. at 1630.)  The plaintiffs' attorney was then unable to

meet the next week (the week of July 23), when IEP Team members were available, because of

court commitments.  (Id. at 1634.)  A meeting during the first three weeks of August was also

not possible due to the vacations of a key IEP Team member and the district's counsel.  (Id. at

1636.)  Finally, a meeting was scheduled for August 31.  (Id. at 1638.)

　　　Between June and August, there were a flurry of emails, faxes, and calls exchanged

between the parties; somehow the sides were unable to agree on one date for a meeting.  The

district's delay in responding to the plaintiffs' requests on several different occasions was less

than admirable; the district did not respond to the plaintiffs' June 7 request until June 20, and

failed to respond to the plaintiffs' August 3 request for a BSEA hearing until August 21, despite

the BSEA's notification that responses to the request were to be filed by August 13.  (Id. at 1626;

AR Ex. Vol. I at 11, 19.)

It was not unreasonable, however, for the hearing officer, after receiving evidence of all these exchanges between the two parties from June to August, to find the parents responsible for this situation.  By refusing to attend meetings in both March and May, the parents significantly impacted the ability of the school district to set up a timely meeting before the summer.  By the time the plaintiffs were finally willing to sit down with the school, they faced the daunting task of  scheduling a last-minute meeting at the end of the school year or during the summer when plans had already been made, including by the plaintiffs' counsel.  At the best of times, convening fourteen people on one particular date is difficult, particularly on an "emergency" basis, but exponentially more so at the end of the school year, a busy time for anyone involved in school activities, and when IEP Team members already had numerous scheduled commitments. The plaintiffs have not persuaded me that the hearing officer erred in finding the development of a 2007-08 IEP delay to be the result of the parents' conduct.

**B.      Implementation of the 2005-06 and 2006-07 IEPs and Joseph's Progress**

**1.      Implementation v. Appropriateness**

Turning next to the issue of alleged changes in the implementation of Joseph's 2005-06 and 2006-07 IEPs, I first address the issue of whether the plaintiffs can even challenge expired IEPs.  The plaintiffs are correct in noting that the BSEA decision never discusses whether the school actually implemented the 2005-06 and 2006-07 IEPs.  The hearing officer did not address this issue because he found that the parents had waived whatever rights they had to challenge past IEPs by accepting all of Hampden-Wilbraham's IEPs for Joseph through March 2007.  (AR Ex. Vol. I at 545.)  The parents themselves have acknowledged that they accepted these IEPs.

(Id. at 533.)  The defendants argue that such acceptance means that the parents have no grounds

on which to question these prior IEPs, even if the district did change the IEPs' implementation.

The hearing officer noted that both the courts and the BSEA have repeatedly held that

hearing officers are precluded from revisiting or re-opening accepted IEPs that have expired

where parents participated in the development of the IEP.  (Id. at 545.)  The purpose of this rule

is plain; deciding upon which goals and methods to include in any student's IEP is not an exact

science, and allowing parents to second guess IEP decisions after it has expired would only

undermine the process of providing students with the educational services they need.

Acceptance of the IEPs as written, however, does *not* waive all allegations that the

district did not provide a FAPE to Joseph when those IEPs were being implemented.  To provide

a FAPE to a student with disabilities, the school district must not only *develop* the IEP, but it

also must *implement* the IEP in accordance with its requirements.  See 20 U.S.C.  § 1401(9)(D)

(A FAPE includes special education and related services that are "in conformity with" the IEP);

34 C.F.R. § 300.323(c)(2) ("As soon as possible" following development of an IEP, special

education and related services must be made available to a student in accordance with that IEP.)

To allow a school merely to write up an IEP without any requirement of implementation would

fundamentally undermine the purposes of the IDEA.  A claim, like that of the Does, alleging a

"failure to implement or noncompliance with an appropriately developed and formulated IEP,"

therefore, "is distinct from a claim alleging that an IEP was 'inappropriate.'"  Ross, 44 F. Supp.

2d at 116.  An expired IEP may therefore be addressed when a party is not challenging whether it

was *appropriate* as written and developed by the IEP Team, but whether it was *implemented*.

Despite this important distinction between appropriateness and implementation of the IEP, the hearing officer failed to address the plaintiffs' claim that the school did not *implement* the IEP.  Instead, the cases the hearing officer cited to support his proposition that the former IEPs could not be revisited are cases in which parents were challenging the *appropriateness* of the IEPs as written.  See Amann v. Stow Sch. Sys., 982 F.2d 644, 650 (1st Cir. 1992); Burlington, 471 U.S. at 362; Amherst-Pelham Reg'l Sch. Dist. v. Dep't of Educ., 381 N.E. 2d 922, 925 (Mass. 1978).  In this case, as previously noted, the plaintiffs are not questioning the *appropriateness* of Joseph's IEPs as written, which they approved.  Instead, they are challenging the *implementation* of the IEPs.  In other words, did the school actually do what it was required to do once the IEPs had been written and approved?

It is clear, therefore, that the issues surrounding the 2005-06 and 2006-07 IEPs are much more involved than a simple question of whether or not the parents signed the forms indicating their approval of those IEPs, as their approval only goes to the question of appropriateness.  Courts have held that accepted IEPs may be revisited in certain circumstances, such as when a school district has not, although required by the IEP, provided a student with certain materials, consultation services or educational instruction, has not developed programs, or has not transported a student to appropriate schools.  See  Ross, 44 F. Supp. 2d at 122; Abney v. Dist. of Columbia, 849 F.2d 1491, 1497 (D.C. Cir. 1988).  The hearing officer's finding to the contrary is an error of law.  As such, I find it necessary address whether there were violations in the *implementation* of the 2005-06 and 2006-07 IEPs in order to determine whether the school district provided Joseph with a FAPE.

### 2.    Implementation of 2005-06 and 2006-07 IEPs

The major changes in implementation the plaintiffs allege fall into two categories: (1) the district stopped collecting data documenting Joseph's progress toward the goals and benchmarks as set forth in the IEPs; and (2) the district made an undocumented, unilateral decision to abandon the methodologies specifically articulated in the IEPs.  As evidence, they cite the testimony of Dr. Maguire, the expert the parents hired to speak at the hearing.  Dr. Maguire testified that in order for the district to implement discrete trial training, direct instruction, or incidental teaching, there must be collection of data, which he believed the district did not sufficiently do.  (See AR Tr. Vol. II at 60:1-16; 67:18-68:9; 118:1-122:11.)  The plaintiffs also note that Allyson Thomas, the district's consultant from the May Institute,[4] testified that the district did not use *some* specific data collection sheets in the 2006-07 school year that had been used in the previous year concerning discrete trial training.  (AR Tr. Vol. VI at 113:14-19.)

The data collection issue is closely connected to the claim that the district abandoned certain teaching methodologies that had been included in the IEP.  Allyson Thomas explained that the district abandoned some data collection because it decided to focus more on direct, individual instruction than discrete trial training[5] as Joseph had shown an increased ability to learn using individual instruction that was not necessarily discrete, but more typical.  (Id. at 113:14-114:4.)

---

[4]  The May Institute is a nonprofit organization specializing in educational, rehabilitative, and behavioral healthcare services for individuals with autism and other developmental disabilities.  The Institute provides consultant services to various individuals and organizations, including public school systems such as the Hampden-Wilbraham Regional School District.

[5]  Discrete Trial Training is a structured method used to educate students with autism in which comparisons are presented, and based on that presentation, selection of a comparison is made, correct selections are reinforced, incorrect selections are not reinforced and at times corrected, and the data are run in a trial by trial fashion through a predetermined sequence.  (Pl.'s Rule 56.1 Statement of Undisputed Material Facts ¶¶ 13, 14.)  The data are then used to determine a student's progress and whether changes to the program should be made.  Id. ¶ 14.

The actual language of the IEPs in question (2005-06 and 2006-07) gives an general overview of what data collection and methodologies the district should be using. The IEPs note that Joseph would need direct teaching in all areas. (AR Ex. Vol. III at 1417, 1437.) They also note that Joseph would work in discrete trial learning *based on his development needs*. (Id. (emphasis added).) For the methodology/delivery of instruction for Joseph, the IEPs note:

> [Joseph] needs a language based curriculum with explicit instructions. He needs a multi-modal approach that pairs as many modalities as possible. Pairing visual cues with auditory instructions will help [Joseph]. [Joseph] needs frequent breaks with a preferred activity interdispersed throughout the day. He responds well to a schedule board, choice board, visual cues throughout the room, and a first, then board. He needs *some* 1:1 instruction in discrete trial to work on specific goals. He needs to be taught to mastery before going on. Mastered items need to be reinforced to ensure continued mastery and generalization to all settings. [Joseph] needs 1:1 teaching of skills, generalizing them to all settings.

(Id. at 1418, 1438 (emphasis added).) These methodologies include generally, "individual instruction, models, prompts, visuals, [and a] multi-sensory approach." (Id. at 1419, 1439.) Finally, the IEPs list the performance criteria as being based on "goals and discrete trial data." (Id. at 1418, 1438.)

As the plaintiffs note, the administrative record does indicate that the district's data collection during the years in question was, at times, sporadic. The school submitted a number of data sheets that were barely, if at all, filled out. (See AR Ex. Vol. IV at 2524-2539, 2592.) The notes by the school's May Institute consultant also include a note that the school needs data sheets. (Id. at 2518.) Thomas Philpott, the Director of Special Education for the district, admitted in his testimony during the hearing that there were "some short falls in [the district's special education programing], and [the district was] trying to improve upon them."

-16-

Specifically, he explained that "[the] whole issue of data collection is going to be worked on." (AR Tr. Vol. IX at 140:13-15, 23-24.)

Despite the erratic data collection, though, the evidence suggests that the district continued to provide Joseph with an adequate education program.  Although some of the data sheets were not filled out, the district did fill out others.  (See AR Ex. Vol. IV at 2540-2571, 2305-2334.)  The district also collected a considerable amount of other data on Joseph.  (See AR Ex. Vol. III at 1291-1313,1538-1608,1649-1651, 1655-1824.)  Dr. Maguire acknowledged in his testimony during the hearing that the district did collect some data points, although not in the way he deemed appropriate.  (AR Tr. Vol. II at 118-21.)  Excerpts from notes taken during the school year also demonstrate that the specialists were using baselines to determine Joseph's progress, even if they were not reporting the data.  (See AR Ex. Vol. IV at 2518-2523.)  Thomas also testified that when Joseph began exhibiting an increase in self-stimulatory behavior, the district did begin to collect data on this issue.  (AR Tr. Vol. VI at 226:22-227:1-9.)

Significantly, there is no indication that the changes that were made to the methodologies used deviated from the requirements of the IEP.  It is clear that the specialists did determine at certain times to focus on using one methodology over another, and would change that focus as they deemed it necessary.  As previously noted, however, these changes were made because the specialists believed Joseph had progressed in such a fashion that a particular methodology would be more appropriate than another.  (See id. at 113:14-114:4.)  The language of the IEP, noted above, gave the school this flexibility and nothing in the IEP restricts its ability to make these decisions.  I therefore find no evidence to support a conclusion that the district erroneously changed teaching methodologies.

-17-

I cannot ignore, however, the absence of data reports during several periods.  Even the district itself seems to recognize the failures in data collection practices.  Although the specialists who worked with Joseph day-to-day may have been so closely in tune with Joseph's abilities and progress they found it unnecessary to report on what Joseph had achieved, the IEPs required data collection.  In proposing a future IEP for the next year, it is important to have data to understand what has been done in the past and what changes can be made in the future.  It is difficult to know whether a student has met the goals of his or her IEP when the data is not there.  Moreover, it is impossible to compare a child's progress against a baseline (as required for Joseph's behavior goals, see AR Ex. Vol. III at 1422, 1442) without an established, reported baseline.  I also find it hard to understand how the school could determine whether Joseph had met his other goals without a written record-- for example, whether Joseph was building a sight vocabulary up to 100 words and could recognize said words in isolation and in context with 80% accuracy.  (Id. at 1423).  It is therefore unclear, based on what the district reported, whether it was implementing Joseph's IEPs with respect to both data collection and methodologies as required between 2005 and 2007.

Consequently, I turn to the test outlined in Ross to determine whether an IEP has been implemented: (1) the "failure" to implement must not be a "complete" failure; (2) the variance from the special education and related services specified in the IEP must not deprive the student of a FAPE; and (3) the provision of special education and related services must make "progress" toward the achievement of the goals stated in the IEP.  44 F. Supp. 2d at 119.  Here, clearly there has not been a "complete" failure to implement.  The appropriate standard is whether the

educational services the district provided to Joseph were still sufficient "to permit [him] to

benefit educationally from that instruction." Rowley, 458 U.S. at 203.

      The administrative record supports a conclusion that the services Joseph received were

sufficient to permit him to benefit.  While his data sheet may not have always been filled out,

Joseph still received supportive instruction from a wide variety of education specialists.  A

speech-language pathologist provided him with services on a daily basis.  (AR Ex. Vol. I at 540.)

An occupational therapist worked with Joseph several times per week.  (Id.)  Joseph also

received the services of a physical therapist.  (Id.)  Joseph spent 2 hours daily working in an

intensive resource room. (Id.)  Joseph also had the benefit of integration with his peers at the

beginning and end of the day, for science and social studies, and for all special classes, including

art, music, physical education and assemblies.  (Id. at 540-41.)  Joseph also had a 1:1 assistant

that worked with Joseph throughout each school day.  (Id. at 541.)  Overseeing Joseph's

instruction and progress weekly was the district's consultant.  (Id.)  Each week, these specialists

would meet to plan Joseph's instruction for the next week.  (Id.)  The data that the district

reported, both numerically and anecdotal, also demonstrate that Joseph received individualized,

supportive education services.  (See, e.g., AR Ex. Vol. III at 1649-1824.)  Thus, the plaintiffs

have not met their burden of proof to convince me that these services provided to Joseph did not

permit him to benefit educationally.

      The plaintiffs also raise the issue of lack of notice to them of changes in implementation

as another basis for finding that the district did not provide Joseph with a FAPE.  The IDEA

notes the importance of "strengthening the role and responsibility of parents and ensuring that

families of [disabled] children have meaningful opportunities to participate in the education of

their children at school and at home." 20 U.S.C. § 1400(c)(5)(B).  In accordance with this

purpose, the IDEA requires that parents must be notified of any proposed changes "in the

identification, evaluation, or education placement of [their] child or the provision of a [FAPE] to

[their] child." 20 U.S.C. § 1415(b)(3).  The Does did receive progress reports during the years

in question detailing how Joseph was progressing in his IEP goals, see AR Ex. Vol. III at 1467-

1526, and attended meetings where the new IEPs were promulgated, see id. at 1430, 1449.  In

any case, the plaintiffs also have not demonstrated how possible implementation and notification

issues ultimately prevented Joseph from the opportunity to benefit from the services the district

provided.  I therefore find that any lack of communication between the parents and the district (if

indeed there was such a deficiency) did not prevent the district from providing a FAPE to

Joseph.

Finally, under Ross, I must determine whether these services allowed Joseph to make

progress towards the achievement of the goals in his IEPs.  The hearing officer discusses

Joseph's progress in his decision in detail.  After a careful review, I therefore defer to his

findings, absent evidence to the contrary.  While the plaintiffs allege that the hearing officer

failed to address whether Joseph made meaningful educational progress within the goal areas

agreed upon by the Team and identified within his IEP, this is simply incorrect.   The hearing

officer explicitly found that Joseph's evaluations showed that he had made progress in areas

relevant to his IEP goals.  (AR Ex. Vol. I at 536.)  The hearing officer based this decision on

numerous tests the school district offered into evidence, including the Assessment of Basic

Language and Learning Skills, the Wechster Individual Achievement Test, the Peabody Picture

Vocabulary Test, the Expressive One Word Vocabulary Test, the Beery Visual Motor

Integration Test, the Motor Free Visual Perception Test, and the Test of Non-Verbal Intelligence. (Id. at 536-7.)

The plaintiffs also argue that the hearing officer ignored evidence they offered showing a lack of progress in key areas.  Plaintiffs, however, have not pointed to anything in the record to support their allegation other than bringing to the court's attention that Joseph has worked towards some similar goals from year to year. (See Pls.' Notice of Clarification of Admin. R. ¶ 20.)  In the face of substantial evidence that Joseph was making progress, I find these citations to Joseph's IEPs to be unpersuasive.

I find, therefore, that the plaintiffs have not met their burden of proving that the hearing officer's findings regarding Joseph's progress during his time in the Hampden-Wilbraham school district were based upon errors or law or fact.  I defer to the hearing officer's factual finding that Joseph made sufficient progress in the Hampden-Wilbraham school district, and find no adequate basis for holding that the school district did not implement the IEPs as required.

### C.    Appropriateness of the 2007-08 IEP

The plaintiffs also contend that the hearing officer erroneously found that the proposed 2007-08 IEP was reasonably calculated to enable Joseph to receive educational benefits.  An IEP must be "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade," but it need not "assure the maximum possible development of a child with special needs."  N.  Reading Sch. Comm. v. Bureau of Special Educ. Appeals, 480 F. Supp. 2d 479, 489 (D. Mass. 2007).  There is little guidance as to how exactly to measure an IEP, see id. (case law "does not articulate in easily replicable language a clear standard that a hearing officer or judge is to use to evaluate an IEP."), but if a hearing officer's findings concerning an IEP are

detailed and supported by the record, there is no reason to disturb them.  Id. at 488.  Ultimately,

what a reviewing court must decide is whether an IEP "is adequate and appropriate for a

particular child at a given point in time."  Burlington, 736 F.2d at 788.

The hearing officer found the IEP to be appropriate to address Joseph's special education

needs while allowing him to be educated in the least restrictive educational environment because

it proposed the utilization of numerous teaching methodologies and different teaching systems.

(AR Ex. Vol. I at 543.)  There is ample evidence in the record supporting the hearing officer's

findings.  The IEP describes the type of methodology that will be used to teach Joseph, based on

what had worked for him in the past.  (See AR Ex. Vol. IV at 2366-68.)  The IEP also sets goals

for Joseph in the upcoming year in fourteen areas and describes steps needed for Joseph to

complete these goals. (See id. at 2369-75.)  The district, in accordance with the IEP, would offer

Joseph highly qualified, experienced special education teachers, including 1:1 assistant, an

occupational therapist, physical therapist, speech language pathologist, and consultation by a

board certified behavior analyst.  (Id. at 2376.)  Furthermore, while Joseph would receive

specialized and individualized educational services, he would also have the opportunity during

the day to interact with his peers.  (Id. at 2369.)

The plaintiffs challenge the 2007-08 IEP as lacking in several different areas.

Specifically, they argue that the IEP does not contain: (1) any specific behavioral

recommendations, which the plaintiffs believe is required because of the nature and severity of

Joseph's interfering behaviors at home and at RCS; (2) plans for generalization of skills to

different settings, which the parents argue had been a goal for him for years; or (3) a "statement

of the special education and related services and supplementary aids and services, based on peer-

reviewed research to the extent practicable, to be provided to the child" as required under 20

U.S.C. § 1414(d)(1)(A)(i)(IV) and 34 C.F.R. § 300.320(a)(4).  The plaintiffs finally contend

that the district did not consider information from RCS regarding Joseph's progress there, and

consequently included in the IEP goals that he had already mastered at RCS.

In terms of behavioral recommendations, the IEP does include steps the district must take

to decrease Joseph's interfering behaviors and keep him on task and productive.  The IEP lists

accommodations necessary to ensure Joseph stays on school tasks, including clear and consistent

routines and expectations, preferential seating near the teacher and away from distractions,

directed, supported play opportunities, guided support through transition periods, behavior plan

for time on task and engagement in activities, and positive reinforcement throughout the day.

(AR Ex. Vol. IV at 2366.)  The IEP also contains a section on the "specific goal focus" of

behavior.  (Id. at 2371.)  The section notes that Joseph's goal would be to progress in four out of

four objectives:

> (1) using appropriate protest words (such as no thank you, I need a break, stop, help) to
> replace yelling 20% above the baseline and to reduce aggression 100% of the time;
>
> (2) reducing self-simulatory behaviors (rocking, vocal perseveration, hand flitting, and
> face lunge) 50% below the baseline;
>
> (3) following 1 step requests within 30 second with 90% accuracy over 3 consecutive
> observations; and
>
> (4) following 1 step requests within 30 seconds with 80% accuracy over 3 consecutive
> observations.

(Id.)  While there is no specific reference in the IEP about how to deal with the interfering

behaviors at home and RCS that the parents reported, the IEP does focus on what can be done in

the environment that the school district can control – school itself.  In setting goals for how to

-23-

minimize Joseph's disruptive behavior at school, it would be reasonable to expect that this work would translate into better behavior at home as well.

Despite the plaintiffs claims otherwise, the IEP also contains statements of the special education and related services and supplementary aids and services that the district was to provide to the student.  These include:

> language-based curriculum, multi-model approach, pairing visualized with auditory instruction, 1:1 teaching, reinforcement of mastered items, discrete trial format, direct instruction, intensive instruction based on applied behavior analysis, small groups, models, prompts, guided support, sensory diet, modified fourth grade curriculum, direct 1:1 speech/language therapy each day, and a 1:1 assistant in all settings.

(Id. at 2367-68, 2380, 3047-48, 3053-54.)  The plaintiffs fail to explain why this is not a satisfactory "statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child." The IEP does not label these services as "based upon peer-reviewed research," but the plaintiffs fail to point towards any case law that requires anything more under 20 U.S.C.  § 1414(d)(1)(A)(i)(IV) and 34 C.F.R. § 300.320(a)(4) than what the IEP contains.

In addition, the IEP includes numerous plans for generalizing Joseph's skills to different settings.  The IEP's "Methodology/Delivery of Instruction" section notes that "mastered items need to be reinforced to ensure maintenance over time and generalization to all settings."  (AR Ex. Vol. IV at 2367.)  Specifically, the IEP lists the skill of engaging in appropriate verbal responses as something that Joseph should work on when isolated with the special education staff as well as something to focus on in social interactions with his peers during the day.  (Id. at 2369.)  He would also work on learning to participate appropriately both with school staff and in

large group activities with other students such as morning job, morning meeting, related arts classes, and whole school assembles.  (Id. at 2369-70.)  The IEP also calls for Joseph to work on his gross motor skills during PE and recess.  (Id. at 2371-72.)  There is no merit to the plaintiffs' claims regarding the generalization of skills listed in the 2007-08 IEP.

Given that the hearing officer's finding is amply supported by the record, I find the 2007-08 IEP to be adequate.

### D.    Adequacy of RCS

Because I agree with the hearing officer's findings that the district did provide a FAPE to Joseph during all the periods in question and that the 2007-08 IEP was reasonably calculated to provide Joseph with a FAPE, I need not reach the question of whether RCS provided Joseph with an adequate education.  See Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 15 (1993) (holding that parents who unilaterally change their child's placement, without the consent of state or local school officials, are entitled to reimbursement only if the public school district violated the IDEA and the private school placement was proper under the Act).

## VI.    OTHER CLAIMS

The plaintiffs have also brought claims under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq., the Fourteenth Amendment to the United States Constitution, and Article CXIV of the Constitution of the Commonwealth of Massachusetts.  As plaintiffs have not presented arguments in support of these causes of action, I find for the defendants on these claims as well.

## VII.    CONCLUSION

-25-

The plaintiffs faced a heavy burden of convincing this Court that the hearing officer's findings were unsupported by the administrative record and should therefore be overturned.  I find that they have not met this burden.

For all of the above reasons, I find **for the DEFENDANTS**, the Hampden-Wilbraham Regional School District and the Bureau of Special Education Appeals of the Massachusetts Department of Elementary and Secondary Education.

**SO ORDERED.**

**Date:  May 25, 2010**          */s / Nancy Gertner*
                         **NANCY GERTNER, U.S.D.C.**